# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                     CR No. 16-4699 JCH

RICHARD CARDONA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Richard Cardona's Motion to Suppress Evidence and Request for Evidentiary Hearing (ECF No. 91). The Court held an evidentiary hearing on the motion on August 6, 2019. The Court, having considered the motion, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motion to suppress should be denied.

    **I.**    **FACTUAL BACKGROUND**

Based on the evidence submitted at the hearing, the Court finds the testimony of the two witnesses to be credible and makes the following factual findings.

On November 25, 2016, the day after Thanksgiving, members of the Albuquerque Police Department ("APD") Foothills Impact Team conducted a tactical operation to watch certain big box stores in the Foothills Area Command in Albuquerque, New Mexico, for criminal activity, particularly for thefts of automobiles and merchandise. *See* Hr'g Tr. 6:4-8:3. The day after Thanksgiving, or Black Friday, has statistically higher crime for thefts. *See id.* 8:6-11. The APD

law enforcement personnel taking part in the tactical operation included Whitney Burton, Jason Allred, Tommy Benavidez, Dolores Sanchez, and Ronald Clipp. *See id.* 11:9-21; Hr'g Ex. A. The APD officers drove unmarked undercover vehicles and wore plain clothes and a badge around their necks. *See* Hr'g Tr. 11:22-12:6.

Sometime between approximately 12:00 p.m. and 12:15 p.m., Detective Burton was surveilling the Best Buy parking lot, located on Hotel Circle in Albuquerque, New Mexico, when she observed a silver Honda driving very slowly up and down the aisles of the parking lot, passing open parking spaces. *See id.* 9:22-11:14, 12:8-13:4, 42:1-43:11; Gov.'s Ex. 1. The Honda backed into a parking space in the northwest corner of the parking lot in between the Best Buy and Babies R Us stores. *See* Hr'g Tr. 13:17-14:16. Detective Burton saw a woman get out of the passenger side of the Honda, approach another parked car, peer into the windows of the car, and try to open the car doors using the door handles. *See id.* 14:18-15:5. She then returned to the passenger side of the Honda. *Id.* 15:5-7.

At that point, Detective Burton notified the other detectives over the secured radio frequency used by the tactical operation about the woman and her actions. *See id.* 15:12-18.[1] Based on Detective Burton's law enforcement experience, she suspected the woman and driver of the Honda of attempting to commit auto burglary. *See id.* 17:19-18:11. It is common in Albuquerque for citizens to leave their vehicles unlocked, so she suspected the woman was trying to open the car doors to take items from within the car for a "quick grab to go." *Id.* 18:4-7. Adding to her suspicion was the fact that neither the woman nor the driver entered a store near the parking lot, despite slowing driving in and around the parking lot. *See id.* 18:12-14.

---

[1] The tactical operation used a radio frequency that was not recorded until the point in time when they called into dispatch at the Tracy address. *See* Hr'g Tr. 17:5-8, 57:11-19. Law enforcement during tactical operations typically use a non-recorded radio frequency so that they can engage in constant car-to-car communications amongst themselves without tying up the air frequencies needed for more important calls. *See id.* 16:13-17:11, 46:14-47:7, 81:12-23.

The Honda then drove out of the parking lot northwest towards Lomas. *Id.* 17:13-15. The detectives on the tactical team began following the Honda as it left the parking lot and drove on back roads. *See id.* 15:24-16:12, 17:16-18, 19:15-19. As they were following the Honda, around the time they were leaving Hotel Circle and driving towards Lomas, Detective Benavidez was able to read the temporary license tag on the Honda and announced the numbers of the tag to the team over the radio. *Id.* 18:15-20, 47:13-48:11, 49:8-19. One of the other detectives ran the tag through the computer in his law enforcement vehicle and informed the team via radio that the tag was registered to a BMW. *See id.* 18:21-25, 48:13-50:6, 52:23-53:5. Detective Burton now suspected that the Honda might be a stolen vehicle. *Id.* 18:25-19:5. Hondas are a highly stolen car in Albuquerque. *Id.* 22:16-17. In addition, the fact that the temporary tag did not match the vehicle to which it was attached is a separate crime. *See id.* 19:6-9.

Other detectives followed the Honda through back roads, while Detective Burton drove to the Baldwin/Indian School intersection where she waited for the car to leave again. *See id.* 19:15-20:5. Based on what the other detectives said over the radio, Detective Burton learned that the Honda went to a home with the address of 11621 Baldwin and the female got out of the car, went up to the house, and appeared to look through something, before returning to the car. *See id.* 20:2-18. It appeared suspicious to the officers that the female walked up to the front of the house and then walked back. *Id.* 20:23-24. The house did not have a "For Sale" sign at the time. *Id.* 21:23-24. For safety reasons, the detectives were waiting for an opportunity to detain the driver and the woman when they were both out of the vehicle, because vehicles have been used as weapons against officers. *See id.* 22:9-23:4.

The Honda left the Baldwin address and drove on back roads until it pulled into the driveway of a home with a Tracy address (hereinafter "Tracy home"). *See id.* 23:8-24:5. The home

3

did not have a "For Sale" sign and it appeared someone lived there because there was property on the side of the house. *Id.* 24:22-25. Detective Burton followed the Honda to the Tracy home and observed the woman walk into the back area of the home, which she found strange and suspicious that the woman would go to the back area instead of the front door. *See id.* 25:14-18, 33:14-34:11. The driver, later identified as Defendant Richard Cardona, got out of the car and appeared to be scanning the area and acting as a lookout. *See id.* 25:15-18, 27:2-4 28:1-14.

At that point in time, based on her training and experience, Detective Burton suspected the couple of committing or attempting to commit the following crimes: having a temporary tag that did not match the car, possessing a stolen vehicle, attempted auto burglary, and attempted burglary of the Tracy home. *See id.* 27:5-24, 33:10-34:11. Detective Burton pulled her unmarked vehicle behind the Honda in the driveway and blocked its egress. *See id.* 26:1-16, 54:6-14. Prior to pulling up behind the Honda in the driveway, Detective Burton had learned the information about the tag being registered to a BMW, not a Honda. *See id.* 53:23-54:5, 57:3-6, 59:1-60:5.

Detective Burton engaged in a felony stop for officer safety reasons while Defendant and his female passenger were both out of the car. *See id.* 32:21-33:9. She jumped out of her vehicle with her firearm drawn and yelled, "Albuquerque Police. Let me see your hands." *Id.* 34:21-22, 54:23-24, 56:1-4. Detective Burton positioned herself behind her own car door, about 15-20 feet away from the suspects. *See id.* 35:22-36:1, 36:24-37:2. The female suspect complied with Detective Burton's command by putting her hands in the air. *See id.* 34:22-24, 35:5-6. Defendant Cardona, however, did not comply. *See id.* 38:3-7. Instead, he started walking over to his female companion, positioned himself right behind her, and put his hand in his right jacket pocket. *Id.* 34:25-35:5. Detective Burton believed he was trying to use the female almost like a shield, *id.* 36:12-18, and he appeared to be gripping something in his pocket, *id.* 36:20-23. Defendant

4

Cardona was also looking back and forth as if searching for an escape route. *Id.* 37:13-15. Because of Defendant Cardona's behavior, Detective Burton believed he had something in his pocket that could harm the officers and she feared he was going to shoot her or her fellow detectives. *See id.* 37:3-7, 39:6-10.

Within seconds, Detective Allred arrived and stood behind Detective Burton's car, and they both yelled at Defendant to get his hands out of his pockets. *Id.* 35:7-10, 36:2-4, 37:8-12. Defendant continued to look to the right and left. *Id.* 35:11-12. Shortly thereafter, Detectives Benavidez, Clipp, and Sanchez arrived and positioned themselves to Detective Burton's left-hand side. *See id.* 35:13-16, 37:16-19. Defendant Cardona did not comply with Detective Burton's commands until the other detectives arrived on scene. *Id.* 38:4-7. It took approximately 30-45 seconds for Defendant Cardona to comply, although it felt more like two to three minutes to Detective Burton. *See id.* 38:23-39:5. Detective Sanchez then placed the female in handcuffs and moved her away. *Id.* 39:11-14. Detective Benavidez talked to Defendant Cardona who told him he had a gun in his pocket. *Id.* 39:15-24. Detectives found a loaded Ruger firearm in his pocket and ammunition. *Id.* 40:2-9.

A grand jury subsequently charged Defendant Cardona with having been convicted of a felony and knowingly possessing a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Indictment, ECF No. 14. On July 9, 2019, the Government superseded the indictment to charge felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Superseding Indictment, ECF No. 116.

## II. ANALYSIS

Defendant contends that he was seized by Detective Burton when she pulled into the driveway blocking Defendant's egress, and that at that time, officers lacked reasonable suspicion

of criminal activity to justify his seizure. Defendant explains his argument as follows:

> A report that the temporary tag attached to Mr. Cardona's vehicle was assigned to another vehicle might give rise to a reasonable suspicion that he was driving a stolen vehicle, depending upon the circumstances. The timing regarding when and whether this was discovered is critical. If it was not discovered until after the inception of Mr. Cardona's detention, the seizure was not reasonable, and the firearm and ammunition evidence discovered subsequently must be suppressed.

Def.'s Mot. 4, ECF No. 91.

"A seizure occurs only when an officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005). An investigative detention occurs when the defendant has an objective reason to believe he is not free to terminate the encounter and proceed on his way. *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996).

An investigative detention is an exception to the probable cause requirement whose reasonableness is determined by a two-part test: (1) whether the officer's action was justified at its inception, and (2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). Reasonable suspicion requires articulable facts that criminal activity may be occurring, a level of suspicion that "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). For reasonable suspicion to exist, the officer must have "some minimal level of objective justification for making the stop" when considering the totality of the circumstances, and the officer does not need to rule out the possibility of innocent conduct. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (internal quotations omitted). Police officers are not required to take unnecessary risks in performing their duties and are authorized to take steps reasonably necessary to protect their personal safety and maintain the status quo during an investigative

detention. *United States v. Shareef*, 100 F.3d 1491, 1502 (10th Cir. 1996).

As an initial matter, the parties dispute at which point Detective Burton seized Defendant. Defendant argues that he was seized when Detective Burton pulled into the driveway blocking his way out and when she announced her law enforcement capacity. Def.'s Mot. 3, ECF No. 91. The Government disputes that Defendant was seized by the positioning of the vehicles because he was already out of his vehicle and not attempting to leave the driveway when officers encountered him. Gov.'s Resp. 8 n.1, ECF No. 95. This dispute, however, does not need to be resolved because the "United States concedes that Defendant was seized when he was commanded to put his hands in the air and get on the ground." *Id.* at 8. The difference of a matter of seconds does not matter here because no additional facts were learned in that time frame and relied upon by Detective Burton for the reasonable suspicion analysis to justify the detention.

Consequently, even assuming for the sake of argument that Defendant was seized when Detective Burton pulled into the driveway, that seizure was reasonable. The Court finds based on the evidence presented at the hearing that *before* Detective Burton pulled into the driveway, she had learned from other detectives in her tactical team that the temporary tag attached to the Honda Defendant was driving was assigned to a BMW. That information gave her probable cause to believe Defendant had committed the state crime of improper use of evidences of registration. *See* N.M. Stat. Ann. § 66-8-2 ("nor shall any person display upon a vehicle any registration evidence, registration plate, validating sticker or permit not issued for such vehicle or not otherwise lawfully used thereon under the Motor Vehicle Code"); *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011) (recognizing collective-knowledge doctrine that allows law enforcement officials to rely on information of other officers to conduct a stop). *Cf. United States v. Edgerton*, 438 F.3d 1043, 1048 (10th Cir. 2006) (concluding that trooper's stop of vehicle to determine its identity was

reasonable under Fourth Amendment because the vehicle's assigned registration was not readily apparent and gave rise to reasonable suspicion that driver was violating state law pertaining to display of license plates). That same evidence also provided her reasonable suspicion to suspect Defendant of receiving or transferring a stolen motor vehicle in violation of N.M. Stat. Ann. § 30-16D-4.

Furthermore, the totality of the circumstances also gave Detective Burton reasonable suspicion to suspect the occupants of the Honda of attempted theft and burglary based on her observations of the Honda driving in the parking lot without the occupants going into the store and of the female passenger checking the car doors of another parked car; the other detectives' observations of the Honda stopping at the home on Baldwin and going up to the house and leaving; and her observations of the Honda stopping at the Tracy home and the female passenger entering the back area of the home. Based on the Court's findings of fact, the Court concludes that the seizure of Defendant Cardona was reasonable, and officers did not violate his Fourth Amendment rights.[2]

**IT IS THEREFORE ORDERED** that Defendant Richard Cardona's Motion to Suppress Evidence (**ECF No. 91**) is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[2] Defendant has not challenged the scope of the detention in his motion or at the hearing. The issue in the Defendant's motion and at the hearing was the reasonableness of the initial seizure of Defendant. Accordingly, the Court will not address issues not raised.